**Rebah Fay SPANGENBURG, Plaintiff in Error,**

v.

**AETNA LIFE INSURANCE COMPANY, Defendant in Error.**

No. 37200.

Supreme Court of Oklahoma.

Jan. 29, 1957.

Philip K. Blough, Tulsa, for plaintiff in error.

Farmer, Woolsey, Flippo & Bailey, Tulsa, for defendant in error.

CARLILE, Justice.

Rebah Fay Spangenburg, widow of John F. Spangenburg, and beneficiary under a life insurance policy, instituted this action against Aetna Life Insurance Company to recover the sum of $5,000 alleged to be due under the terms of a group life insurance policy issued by the said company on the life of John F. Spangenburg. The policy provided for payment of $5,000 upon the death of the insured, and an additional sum of $5,000 in the event of the accidental death of the insured, subject to certain conditions. Upon the death of the insured the defendant company paid the beneficiary $5,000, but refused to pay any additional amount and alleged in its answer that "the insured did not die accidentally, pursuant to the requirements of the accidental feature of the policy", and further denied that the plaintiff made proof of loss as required by the policy.

A jury was empaneled to try the issues arising, and at the conclusion of plaintiff's evidence the defendant demurred thereto upon the ground that the same was not sufficient to make out a case in favor of plaintiff and against the defendant. The demurrer was sustained and judgment rendered for defendant. The parties will be referred to herein as they were in trial court. The plaintiff appealed and in support of her assignments of error asserts:

"The Court erred in sustaining a demurrer to the plaintiff's evidence and accordingly erred in failing to submit to the jury the factual issue of accidental death."

■■ And in connection with the above proposition further asserts that in reviewing an order sustaining a demurrer to the evidence the court is required to disregard the evidence most favorable to the demurrant, and that insurance contracts must be liberally construed in favor of a policyholder or beneficiary thereof where the contract is ambiguous or susceptible of different constructions. The latter two propositions are substantially correct and will be taken into consideration in connection with the main, or first proposition, and argument thereon.

Plaintiff, in her brief, makes the statement that the insured died as a result of a strain, and whether or not his death was an accident presented a question of fact for the jury.

The plaintiff, in support of her allegations that her husband, the insured, suffered an accidental injury which resulted in his death on March 18, 1952, testified that her husband was working at the Douglas Aircraft plant and that he came home between 10:00 and 11:00 P.M. and asked for the heat pad; he said something went wrong with his arms at work. He went to bed and about 5:00 o'clock the next morning he awoke her by making a struggling noise, but did not speak. An ambulance was called and he was pronounced dead upon arrival at the hospital.

Ray Lawson was called as a witness by plaintiff and testified in part that he was working as a crane operator at the Douglas plant on the last night Spangenburg worked, that in his operator's position he had a full view of the floor 35 or 40 feet below him, that Mr. Spangenburg was working there as a rigger along with Earl Forrest, an assistant. The operator said his job in part was to lower the chokes (cables) as near the rigger as he could so the rigger wouldn't have to walk around or

even step to reach the cables; that it is customary for the rigger to hold up his hands to designate to give him the cables; that about 8:00 o'clock that evening when he, the operator, lowered the chokes, or cables, Mr. Spangenburg held up his hand, and instead of taking hold of the chokes he just sat down on a pile of steel which was handy and Earl Forrest stepped up and did the job. The witness was asked if it was necessary for the rigger to give any signal and answered:

"The rigger goes to the job, designates what point you ought to go—anyway, it is understood when he steps before an object, whether steel, machine, or what, that's what you are going to pick up. You lower the chokes—if he wants it on one side of the object he stands up and raises his hands so you will know.

"Q. Do you recall his giving the signal that night? A. I don't know that he gave a signal—he knew what the job was. * * *

"Q. Will you show us what he did in reaching,—if he did reach? A. When I put the chokes down to him, he reached up his arms, like that (indicating) to have the chokes close enough to him—when they got close to him he went down, like that—(indicating)."

Witness further stated that the stack of aluminum sheets which they were moving was about waist high, 3 feet wide by 4 feet long; that in about five or ten minutes Mr. Spangenburg walked over and got in a little motor outfit that pulls miniature trains around the plant; that he drove the tug to the foot of the steps, where he got out and came up the three flights of steps to the third floor. When he got to the top of the stairs he went over on his hands and knees, and witness said he got something to put under Mr. Spangenburg's head, and in a little while Mr. Spangenburg became sick at his stomach and walked to the rest room, then came back and laid down; then witness called his supervisor. On cross-examination the witness testified that he saw

and talked with Mr. Spangenburg at the stock room shortly before they went to work and Spangenburg said he was burning up inside and wondered if he should quit smoking—said his ulcers were bothering him. The witness said Mr. Spangenburg did not slip or fall, and explained further how the electric crane was used when in operation, and again demonstrated what the rigger's signal was in asking for the chokes, and affirmatively agreed with the question:

"Your arms are a little stretched out forward from your body and higher than your body?"

A photograph was taken of the position as demonstrated by the witness and is incorporated in the record.

Portions of a deposition of Earl Forrest, who worked with Mr. Spangenburg at the Douglas plant during 1951 to 1953, were read, in which the witness testified that they were working together the last night Spangenburg worked. He was asked:

"Q. What, if anything, unusual happened as far as Mr. Spangenburg was concerned at the time you last saw him? A. Well, we were working on this sheet material, aluminum material, and he complained of being sick, and I told him to go over there and sit down, which he did, and that is about the last I saw of him.

"Q. Did you notice Mr. Spangenburg's appearance at that particular time, at the time he spoke to you? A. Well, yes. * * * He got kind of white in the face."

Witness in describing the kind of work they were doing was asked:

"Q. * * * How far was it necessary for him to reach; how far did he reach? A. According to the height of your material. I would say just about as far as you could reach over like this and grab your chokes."

Dr. L. was called by plaintiff and testified that he performed an autopsy on the body of John F. Spangenburg and made a written report thereof on March 19, 1952, which report was put in evidence and under the heading "Pathologic Diagnosis" shows eight findings. The first three are as follows:

"1. Severe arteriosclerosis of the coronary arteries.

"2. Subacute and recurrent acute thrombosis of the right coronary artery.

"3. Old partial stenosis of the right coronary artery and of the circumflex branch of the left coronary artery."

The doctor was asked what the autopsy revealed with reference to Mr. Spangenburg's heart and answered:

"Severe arteriosclerosis of the coronary arteries, and a fresh very long blood clot affecting the right coronary artery."

and stated that the cause of his death was arterio thrombosis, and said that he had a prior thrombosis, but assumed it was not obstructing because there was no evidence of any lesions in the heart. A hypothetical question was submitted to the witness and he was asked if he had an opinion as to whether or not that reaching would be sufficient physical exertion upon this man to cause a heart attack and the witness answered in the affirmative. Then he was asked:

"Q. What is your opinion, doctor?" and answered:

"A. My opinion is that any physical exertion is sufficient in the case of a coronary artery, and since it is we insist that the patient be kept in a state of complete rest, as complete as possible."

On cross examination of the witness reference was made to his written pathological diagnosis and he was asked what is severe arteriosclerosis of the coronary arteries, and answered:

"Narrowing of the luminum artery caused by the thickening of the walls, inner layer of the walls. * * *

that luminum is the inner side of the heart or the tube inside."

He was then asked:

"Q. Is that something that comes on you suddenly or is developed over a long period of time? A. Oh, no, developed over a long period of time."

and further stated that from his autopsy he would say that Mr. Spangenburg had been suffering from the arteriosclerosis several years; that coronary arteries supply the heart with blood. The doctor further explained his autopsy report and stated that it means in part that two or three weeks before the patient died he had an occlusion (obstruction) in a small place, probably not complete, of this coronary artery on the right side. And further explained that a thrombosis is a blood clot and that the deceased had had an old thrombosis—that it had been in existence some two or three weeks. The doctor also conceded that a burning inside deceased could have well been a forerunner of thrombosis and frequently taken for indigestion. The doctor was asked if the cause of the man's death was coronary thrombosis and answered yes.

Dr. CSL was called by the plaintiff and was asked to explain the meaning of the autopsy on the body of Mr. Spangenburg, which revealed his death was caused from a fresh thrombosis of the right coronary artery, which superimposed on a somewhat older thrombosis. The witness explained that the heart is a muscle—its main function is to pump blood supplied by coronary arteries; that thrombosis is a blood clot, and in this instance apparently two clots, one recent and one old, were found in the right coronary artery, filling the vessel with clot and, therefore, not allowing the blood to go through to the heart muscle. The doctor's opinion is chiefly revealed by the following from his testimony:

"Q. Then arteriosclerosis of the coronary arteries is a bodily infirmity, would you say it is a contributing factor to this man's demise? A. Very definitely. * * *

"Q. Would you say that those subacute and recurrent acute thrombosis would be included in the category of a bodily infirmity? A. Very definitely.

"Q. And would you say they contributed substantially to this man's death? A. Yes, in that they are part of this general disease you describe as arteriosclerosis."

Witness was asked by the Court:

"Q. Doctor, considering the condition that this man's heart was in as shown by this autopsy immediately prior to his going to work that night, what physical exercise would have been safe for him in that condition? A. If he were my patient and I knew what was going on and I knew that he had had these previous episodes describing the clot, I would have had him in bed. * * *

"By Counsel:

"Q. Doctor, any ordinary usual physical exertion like I am walking around lifting my arms up is perfectly normal in a normal man could cause a heart attack in anybody who was in this condition this man was in? A. Yes. * * *

"Q. Then most of the contributing factors of this man's death had already existed before this man's reaching? A. I think he would not have developed this thrombus which apparently caused his death had he not had this pre-existing disease."

The pertinent accidental death provisions and exclusions of the policy are as follows:

"The employe will be entitled to a benefit determined from the following table of benefits immediately upon receipt of due proof; (a) that he has, while insured under the group policy, sustained any of the losses listed in said table of benefits; and (b) that such loss resulted directly and independently of all other causes, from bodily injuries (including bodily injuries arising out of or in the course

of employment) sustained solely through accidental means; * * *.

"Exclusions:

"Accidental death and dismemberment insurance does not cover any loss caused directly or indirectly, wholly or partly, or contributed to substantially by bodily or mental infirmity; * * *."

The plaintiff cites as applicable to the present action the case of New York Life Ins. Co. v. Wise, 207 Okl. 622, 251 P.2d 1058, 35 A.L.R.2d 1099, in which this court sustained the action of the trial court in submitting to a jury the question of whether the death of the insured was caused by accidental means under the double indemnity clause in the policy sued on, and a question of whether the deceased suffered a bursted blood vessel from a violent effort or strain. The opinion recites that the insured spent an hour attempting to push a car stuck in the snow, and that his feet would slip and he would stumble. No autopsy was made of the body of the deceased in that case. We do not consider the holding in that case as controlling under the evidence in the present action.

Another case cited by plaintiff is Equitable Life Assurance Society, etc. v. Neale, Okl., 258 P.2d 654, in which one doctor testified that, in his opinion, the deceased died from a blow on his head when he fell and another testified, in his opinion, death resulted from a heart condition. The opinion there holds the evidence sufficient to support the verdict of the jury.

Other decisions of this court are also relied upon, but each involved a different set of facts and none are considered controlling under the record here presented. Numerous decisions construing and applying the accidental provisions in policies similar to the one before us are available, but a difference in the facts in the different cases materially affect the application of the established principles of law and result in a diversity of opinions.

There was no conflict in the evidence in the present action. Plaintiff asserts that the deceased suffered a severe strain, loca-

tion not indicated, when he reached up in an effort to grab some chokes (cables) dropped from an overhead crane. The testimony of the crane operator was that the cables were gradually lowered and he said that when the chokes were close to Mr. Spangenburg he went down, kind of wilted, and sat down on a pile of steel. There is no material evidence to show that the insured was hurrying in the work or that he was subjected to a strain, or suffered an accidental bodily injury within the terms of the policy. The undisputed evidence is that the insured had been for a considerable period of time suffering from severe arteriosclerosis of the coronary arteries and that any physical exertion by him was sufficient to cause a heart attack. Both physicians, one of whom specialized in heart diseases, were of the opinion that a coronary thrombosis was the cause of insured's death.

In Phillips Petroleum Co. v. Eaves, 200 Okl. 21, 190 P.2d 462, 463, this court vacated an award by the State Industrial Commission for an alleged injury to claimant's back, and in referring to the evidence stated as follows:

"If his injury to the back was the result of merely stooping over, as every body has occasion to do frequently in movement and use of the body, whether in furtherance of employment or not, then the occurrence would not be an accident and any injury therefrom would not be compensable because not of accidental origin. It would be merely a lamentable result of an ordinary employment of the body unattended by any accidental circumstances. Such occurrences are not accidental and, therefore, not covered by the Workmen's Compensation Law, [85 O.S.1951 § 1 et seq.], Oklahoma Leader Co. v. Wells, 147 Okl. 294, 296, P. 751; National Biscuit Co. v. Lout, 179 Okl. 259, 65 P.2d 497. * * * Under the claimant's testimony—* * the finding that an accident occurred was based on conjecture. * * *."

If the evidence had been sufficient in the present case to justify a finding that the insured suffered a bodily injury through accidental means the plaintiff still would not be entitled to recover under the policy and the evidence, because the evidence established that the insured had a bodily infirmity which caused, or materially contributed to the death of the insured, and the exclusion clause in the policy applies to such condition and excludes a recovery. The exclusion clause is in part as follows:

"The Group Accidental Death and Dismemberment insurance does not cover any loss caused directly or indirectly, wholly or partly, or contributed to substantially, by bodily or mental infirmity, * * *."

Great Northern Life Ins. Co., etc., v. Farmers' Union Co-op Gin Co., 181 Okl. 370, 73 P.2d 1155, 1156, holds:

"In an accident policy wherein the risk assumed by the insurer is limited to disabilities resulting solely from accidental means, directly or independently of all other causes, and excluding disabilities caused directly or indirectly, wholly or partly, from disease, the contract is the measure of the liability; such a provision is binding, and in an action on the policy wherein the uncontradicted evidence is that the disability was the concurrent result of accident and pre-existing disease, verdict and judgment for plaintiff will be reversed."

McCarty v. Occidental Life Ins. Co. of Cal., Okl., 268 P.2d 221, involved an insurance policy with provisions similar to the one before us, and holds:

"In action on limited accident policy, plaintiff has burden to prove that accident was covered by policy, and that accidental injuries caused death, directly and independently of other causes.

\* \* \* \* \* \*

"Words 'disease' and 'bodily infirmity' in group insurance policy providing for payment of benefits for accidental death not resulting therefrom are practically synonymous and refer only to an ailment or disorder of settled or established character to which the insured is subject and which materially impairs, weakens or undermines condition of insured."

The undisputed testimony is that the insured suffered a severe heart ailment for a considerable period of time prior to his death, and that such ailment, which Dr. CSL said was a disease, caused or materially contributed to his death. Under such undisputed facts the terms of the policy excludes coverage of the benefits enumerated and precludes any recovery by plaintiff.

It is not error for the trial court to sustain a demurrer to plaintiff's evidence when the evidence is insufficient, as a matter of law, to justify a verdict and judgment in favor of the plaintiff. Randall v. Paine-Nichols Abstract Co., 205 Okl. 430, 238 P.2d 319, 28 A.L.R.2d 887.

We find and hold, as a matter of law, that plaintiff's evidence was insufficient to establish a cause of action against the defendant, and that the trial court did not err in sustaining a demurrer to the plaintiff's evidence.

In view of our holding we deem it unnecessary to consider the merits of the proposition presented by the defendant to the effect that no written notice of the injury or claim and proof of death was made, as required by the terms of the policy.

Judgment of the District Court is affirmed.